J-A29015-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| GINGER CUNNINGHAM | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CARLA PICARDO, M.D. | : | No. 569 WDA 2019 |

Appeal from the Judgment Entered April 11, 2019
In the Court of Common Pleas of Erie County Civil Division at No(s):
10274-2013

BEFORE:   BENDER, P.J.E., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY BENDER, P.J.E.:          **FILED MARCH 27, 2020**

Appellant, Ginger Cunningham, appeals from the judgment entered in favor of Appellee, Carla Picardo, M.D., following a jury trial.[1]  We affirm.

We briefly summarize the relevant facts and procedural history of this matter.  On May 29, 2013, Ms. Cunningham filed a complaint against Dr. Picardo, a medical doctor practicing obstetrics and gynecology at Erie Women's Health Partners, alleging that Dr. Picardo performed surgery on her without her consent, informed or otherwise.  **See** Complaint, 5/29/13, at ¶ 41; N.T. Trial, 3/13/19, at 50-52.  The case proceeded to a two-day jury trial in March of 2019.

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The caption incorrectly named Appellee as "Carl A. Picardo, M.D.," instead of "Carla Picardo, M.D."  We have amended it accordingly.

At trial, Dr. Picardo testified that Ms. Cunningham became a patient of hers around August of 2010.  N.T. Trial, 3/13/19, at 54-55.  At that time, Dr. Picardo explained that Ms. Cunningham had been having repeated problems with her Bartholin's gland.  *Id.* at 55.[2]  Consequently, during an appointment with Ms. Cunningham on January 26, 2011, Dr. Picardo stated that she recommended the excision of Ms. Cunningham's right Bartholin's gland, an unusual and drastic procedure.  *Id.* at 61-62, 65-66.  At that appointment, Dr. Picardo recalled telling Ms. Cunningham that she had never removed a Bartholin's gland herself, had only seen it done once when she was a resident nine years prior, and that she was not comfortable doing the procedure by herself.  *See id.* at 66-67.  Specifically, Dr. Picardo testified:

> The message I was getting across is this is not a procedure I would do solo, by myself.  I would have to have -- I didn't say this directly, but I -- in my mind the idea is you do surgery; if you are not feeling comfortable specifically with what you're doing, having the proper assistant can actually bridge that gap of experience.

*Id.*  Because she did not have experience with the procedure, Dr. Picardo said that she offered to refer Ms. Cunningham to a specialist in Pittsburgh.  *Id.* at 68-69.  However, Dr. Picardo testified that Ms. Cunningham expressed that

---

[2] We note that the Bartholin's glands "are located on each side of the vaginal opening.  These glands secrete fluid that helps lubricate the vagina."  *See* "Bartholin's cyst," Mayo Clinic (April 26, 2018), https://www.mayoclinic.org/diseases-conditions/bartholin-cyst/symptoms-causes/syc-20369976 (last visited Mar. 6, 2020).  Dr. Picardo explained at trial that the Bartholin's gland is "pea-size[d], maybe a little bit bigger, and it sits sort of in its little bed to hold it, and you can feel that area when you do a vaginal exam, which involves one single-gloved finger to kind of go inside the vagina and feel into that area…."  N.T. Trial, 3/13/19, at 57.

she would like to stay in Erie if there was someone there who could do the procedure. *Id.* at 69. As a result, Dr. Picardo said she offered to go speak with her partners to see if one of them was comfortable with a Bartholin's gland excision. *Id.* Dr. Picardo stated that, at the time, the concept she hoped to provide to Ms. Cunningham was that she would "like to see if they have experience, could help with the procedure." *Id.*

Dr. Picardo articulated that she then left the exam room, and went to speak to her partner, Dr. Jennifer Stull, D.O. *Id.* at 72. According to Dr. Picardo, Dr. Stull told her that she had performed Bartholin's gland excisions in the past, and was willing to assist with Ms. Cunningham's case. *Id.* at 73. Dr. Picardo explained that she then went to speak to her other partner, Dr. Francis Tseng, M.D., who conveyed to her that he was not comfortable being the main person performing the procedure, but would be available as a backup. *Id.* at 74-75.

Dr. Picardo articulated that she subsequently returned to Ms. Cunningham's exam room, and conveyed to her "the concept … that I talked to Dr. Stull, she's willing to be there, is willing to help." *Id.* at 76. When asked whether she specifically told Ms. Cunningham that Dr. Stull would be assisting her, Dr. Picardo replied:

> When we consent patients, we don't typically go into who's going to do exactly what, because that's not something that we do ourselves. When we go into surgery, there's the responsible surgeon and someone who is also there, we call it the assistant, because a lot of times we consider these formal titles. But as the surgeon that also means -- it doesn't mean necessarily you're the only one doing the surgery, but you are responsible. You are

responsible for the consent, the paperwork, seeing the patient beforehand, making sure all the supplies are in the operating room, seeing the patient afterwards, writing all of the care for the patient after the surgery, dictating the record. And how much you do, sometimes the main surgeon and the assistant surgeon, the attending surgeon and the assistant surgeon are doing half and half. We don't sort of decide you're going to do this part, I'm going to do this part.

So that's where I think there becomes some confusion about labeling someone the surgeon or the assistant. There's the attending, or the responsible, surgeon, which was me, because I did everything that the attending[,] responsible surgeon would do. And Dr. Stull was my assistant, but as an assistant[,] she basically could do a lot or a little of the surgery. And in my mind she was … the appropriate assistant to have, because she would be there with the knowledge of where[,] … if I felt like I was having difficulty finding the Bartholin's gland[,] she would be able to either do that part or help me.

*Id.* at 77-78.

During the January 26, 2011 appointment, Dr. Picardo testified that she shared with Ms. Cunningham the risks of surgery, her alternative choices, and a description of the procedure. *Id.* at 91-93, 133-38. Dr. Picardo recalled that she filled out a written consent form. *Id.* at 93. On the consent form, "Picardo/Stull/Tseng" appears next to "Physician's Name." *See id.*; Ms. Cunningham's Exhibit 5. Dr. Picardo indicated that she always included all the physicians' names so that patients knew that these physicians "could be involved with their surgery[,]" but stated that she does not "give a specific role" for them. N.T. Trial, 3/13/19, at 93. Dr. Picardo stated that she has never been taught that a physician must tell a patient how surgery responsibilities are going to be divvied between the attending surgeon and anyone else, and that such information is not required to obtain informed

- 4 -

consent. *Id.* at 139. With respect to Ms. Cunningham's written consent form, Dr. Picardo testified that:

> [W]hat the patient should take from this in my mind is [that] those are the people who are allowed to be involved with her surgery, that she is consenting to be allowed to be in the room, potentially participate in the surgery itself. And that is how it explains. With Dr. Tseng[,] I was very specific saying I doubt he will be there but I put his name on for completion and for your permission.

*Id.* at 94-95. Ms. Cunningham signed the consent form. *See* Ms. Cunningham's Exhibit 5.

Dr. Picardo testified that Ms. Cunningham's surgery occurred on February 8, 2011. *See* N.T. Trial, 3/13/19, at 95. Dr. Picardo recalled that she had a conversation with Ms. Cunningham in the holding room before the procedure took place, and explained that the attending surgeon must see the patient before surgery. *Id.* at 95-97. During Ms. Cunningham's surgery, Dr. Picardo testified that she made the incision, dissected the tissue to the gland, removed the gland, and placed the sutures. *Id.* at 104-06. Dr. Picardo agreed that Dr. Stull's involvement was limited to cutting sutures, suctioning and sponging blood, and protracting tissue. *Id.* at 105-06.

Dr. Picardo stated that she planned post-operation appointments with Ms. Cunningham. *Id.* at 109-10. At an appointment on April 1, 2011, Dr. Picardo remembered that Ms. Cunningham brought up that "she was unhappy about how her vulva looked" and that she was having pain with sex. *Id.* at

112-13.[3]  Dr. Picardo recalled Ms. Cunningham's complaining that her labia minora are uneven and not exactly the same size.  *Id.* at 115, 118.[4]  However, after examining her, Dr. Picardo said she determined that it looked like "the normal range of asymmetry" and could not see what Ms. Cunningham meant.  *Id.* at 115.  Dr. Picardo testified:

> [W]e … reviewed the surgery, because I don't remember the exact words [Ms. Cunningham] used but I think she gave me the impression that she felt I had removed something, which was not the case at all.  And I went in and spent 15 minutes explaining or reviewing the surgical method.  And I told her I'm not sure why -- if you feel there's a difference in the symmetry, I don't know why that would happen, there's nothing that I specifically did during the surgery or that we did during the surgery, anything involved in the surgical method, that could explain that, because we weren't involved on the outside, we were on the inside.  Single incision, no tissue was removed from the skin itself, the only tissue that was sent to pathology was the Bartholin's cyst slash gland.

*Id.* at 115-16; *see also id.* at 122 ("I couldn't explain a logical reason for it to [look different after the surgery] since no tissue was removed during surgery related to the skin, the only part that was removed was the Bartholin."); N.T. Trial, 3/14/19, at 72-73 (stating that the incision was made inside of the vagina and nothing was done to any of the labia).  Dr. Picardo stated that she did not observe any missing labia, but only asymmetry, which she said is not an abnormal finding.  N.T. Trial, 3/14/19, at 77.

---

[3] The parties referred to the external genitalia as the vulva at trial.  N.T. Trial, 3/13/19, at 22, 33, 99.

[4] In lay terms, the labia minora are the smaller lips around the vaginal opening.  *See* N.T. Trial, 3/13/19, at 113-14.

Ms. Cunningham also testified at trial. She explained that, during her January 26, 2011 conversation with Dr. Picardo about the procedure, Dr. Picardo "told [her] that she had not excised a Bartholin's gland before, that she was not comfortable doing the procedure herself, and that she would speak to her colleagues about it to see if one of them would be available to do it." *Id.* at 169-70. Ms. Cunningham said she did not remember Dr. Picardo offering to refer her to a specialist in Pittsburgh. *Id.* at 170. Ms. Cunningham explained her understanding of what Dr. Picardo had told her as follows:

> [Ms. Cunningham's attorney:] Tell us about how you responded to what you were being told. When [Dr. Picardo] told you she'd never done it, wouldn't do it alone and was going to talk to one of her partners, what were you understanding that she was telling you?
>
> [Ms. Cunningham:] That one of her partners would be doing the surgery. And that was more confirmed to me at that point, because I recall after Dr. Picardo came back in to talk with her partners that she had said that Dr. Stull had done these surgeries, was comfortable with them, and then asked me if I was okay since she was my doctor that she [would] be there and be present during the surgery. I recall her asking if she could scrub in to be there.
>
> [Ms. Cunningham's attorney:] When you say she asked if it was okay for her to scrub in, is that Dr. Picardo asked if it was okay?
>
> [Ms. Cunningham:] Yes.
>
> [Ms. Cunningham's attorney:] So she leaves the room, comes back and tells you Dr. Stull has done this before, Dr. Stull is comfortable doing it, and asks if it's okay for her to scrub in?
>
> [Ms. Cunningham:] Correct.
>
> [Ms. Cunningham's attorney:] And what was your understanding about what Dr. Picardo would be doing in the process?

[Ms. Cunningham:] Um, I thought it was great that she wanted to be there, because she was my doctor, I was comfortable with her. I was also comfortable with Dr. Stull, because of the incision and drainage that she had done previously, so I had met her and was cared for by her well. And I thought they all seemed to be caring about my outcome.

*Id.* at 170-71. Ms. Cunningham testified that she understood that "Dr. Stull was performing my surgery[,]" and "expected [Dr. Picardo] to be there for me as her patient and maybe hand a pair of scissors in or something that, you know, would be needed by Dr. Stull." *Id.* at 175. According to Ms. Cunningham, "[n]owhere in my mind did I think Dr. Picardo was going to cut into me, did I think Dr. Picardo would be the one removing the gland from me, did I think Dr. Picardo would be the one putting stitches in me…." *Id.* at 202. She said she understood that "Dr. Stull would do the surgery, Dr. Picardo would be present or possibly assist, and Dr. Tseng would be available that day if … need be for any emergency[,] for backup." *Id.* at 206.

Ms. Cunningham said that she did not speak to Dr. Picardo on the morning of her surgery, and has no memory of the operating room because she was under anesthesia. *Id.* at 175-76. Following her surgery, Ms. Cunningham recalled her fiancé telling her that Dr. Picardo had talked to him after the procedure, and Ms. Cunningham "remember[ed] thinking that it was weird that she had come to speak to him, because I thought Dr. Stull was doing the surgery and I expected her to speak with him." *Id.* at 176-77.

Shortly after surgery, Ms. Cunningham testified that she called in to see a physician before her scheduled two-week post-operation appointment because she was in a lot of pain, and was examined by Dr. Stull, who told her

that she thought "Dr. Picardo did a good job." *Id.* at 178-79, 181. Ms. Cunningham said that this comment suggested to her that Dr. Picardo was her lead surgeon, which upset her, but she was distracted by her pain at that point. *Id.* at 181.

Ms. Cunningham testified that she had two post-operative appointments with Dr. Picardo. At the first appointment on February 26, 2011, Ms. Cunningham remembered that she was healing well, and her pain had improved. *Id.* at 181-82. Though she had concerns about her appearance, Ms. Cunningham stated that she did not say anything to Dr. Picardo at that point because she was still healing and "swelling was going down, bruising was resolving." *Id.* at 182. However, at her second post-operative appointment on April 1, 2011, Ms. Cunningham recalled that she "did have some time to heal up, quite a bit, in that period of time [from February to April], and things did not look better at all. As swelling went down, it was very apparent to me that the bottom portion of my labia minora was gone…." *Id.* at 183. In addition to sharing her concerns about her appearance with Dr. Picardo, Ms. Cunningham said she also conveyed that she was still experiencing some pain. *Id.* at 183-85. She recalled Dr. Picardo's discussing plastic surgery and physical therapy with her, and prescribing topical ointment to treat her pain and a steroid cream to help with skin elasticity. *Id.* at 184-86.

Ms. Cunningham testified that she felt betrayed and misled by Dr. Picardo, and said she "can't and couldn't understand the concept of why she

would perform this surgery when she clearly told me she had never done it and we clearly discussed Dr. Stull doing the surgery." *Id.* at 186-87. She stated that her "feelings go to this is permanent, my labia is not going to grow back, I was stuck with this, and it was a real struggle for me, my confidence, my dignity." *Id.* at 186. Ms. Cunningham relayed that the left and right sides of her labia minora were symmetrical before the surgery. *Id.* at 187-88, *see also* 189.[5] Ms. Cunningham claimed that, after the surgery, the right side of her labia minora "no longer goes to the bottom of the vaginal opening. I am left with the top half of my labia minora." *Id.* As a result, Ms. Cunningham stated that, "with what I was left with[,] this disfigurement from the surgery, it's impacted me in many different ways, in many different relationships of [*sic*] my life; in my trust of doctors, for myself, for my son, for my father, for my mother, for my patients that I was taking care of [while working as a nurse]. It's … really put a lot of distrust in me there." *Id.* at 198. She also noted that it presented a struggle in her marriage and, since getting divorced following the surgery, she feels embarrassed to tell future partners about what happened to her. *See id.* at 193-94, 199.

Dr. Stull's deposition was read at trial, where she indicated that she remembered having a discussion with Dr. Picardo about Ms. Cunningham's case, that it was common for them to talk to each other, and that it was

---

[5] At trial, Ms. Cunningham's sister and mother both testified that Ms. Cunningham's vulva looked different after the surgery, and noticed that part of her labia was missing. *See* N.T. Trial, 3/13/19, at 163, 211.

standard practice for their office to have two doctors involved with any surgery. N.T. Trial, 3/14/19, at 27, 29. Dr. Stull said that she did not remember whether Dr. Picardo told her anything about Dr. Picardo's own experience with Bartholin's gland excision surgeries. *Id.* at 30. When questioned about her understanding regarding who was responsible for Ms. Cunningham's surgery, Dr. Stull conveyed:

> [Ms. Cunningham's attorney:] Did you have any understanding earlier, during that initial discussion with Dr. Picardo, about who was going to be the attending surgeon and who would be the assisting surgeon?
>
> [Dr. Stull:] Well, she would have been the attending. It was her patient. She was the one that got the consent, and I would have assisted.
>
> [Ms. Cunningham's attorney:] Why did you understand that she was going to be the attending and you would be the assistant?
>
> [Dr. Stull:] Because it was her patient. It was her consent. The surgery was scheduled under her.
>
> [Ms. Cunningham's attorney:] Okay. And what does it mean to be the attending surgeon versus the assistant surgeon?
>
> [Dr. Stull:] The attending is the primary. The assistant is the one that retracts and basically just assists in the OR.
>
> ***
>
> [Ms. Cunningham's attorney:] Was there ever a specific discussion that you had with Dr. Picardo before the surgery about allocating responsibility?
>
> [Dr. Stull:] No.
>
> [Ms. Cunningham's attorney:] You had the general understanding that you would be the assistant and she would be the attending and that meant she would have primary responsibility?
>
> [Dr. Stull:] Correct.

[Ms. Cunningham's attorney:] And you would assist. Did Dr. Picardo ask you for any advice or guidance about how the procedure should be performed?

[Dr. Stull:] Well, that's standard practice. I can't tell you with this particular case if she did, but we always do that in the OR. We always, you know, any time you question, you know, what are your thoughts, you know, it's part of working as a team.

*Id.* at 30-32. Dr. Stull testified that her involvement in Ms. Cunningham's surgery was limited to cutting sutures, retracting tissue, and suctioning and sponging blood so that the visual field is clear. *Id.* at 36.

Following trial, a jury returned a verdict in favor of Dr. Picardo, determining that she proceeded with the surgical procedure upon Ms. Cunningham with proper informed consent. Thereafter, Ms. Cunningham filed a timely post-trial motion, which the trial court denied. On April 11, 2019, judgment was entered in favor of Dr. Picardo and, on April 16, 2019, Ms. Cunningham filed a timely notice of appeal. The trial court subsequently ordered Ms. Cunningham to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, and she timely complied.

Presently, Ms. Cunningham raises the following issues for our review:

A. Did the trial court err when it allowed the defense to argue lack of negligence in this informed consent case?

B. Did the trial court err by limiting the material "facts" of which a patient must be informed to material "risks"?

C. Did the trial court err when it refused to instruct the jury that a patient must be correctly advised of the professional credentials, training and experience of her primary surgeon?

Ms. Cunningham's Brief at 4 (unnecessary capitalization omitted).

- 12 -

**Issue 1**

In Ms. Cunningham's first issue, she argues that the trial court erred when it allowed the defense to argue lack of negligence in this informed consent case, and asserts that the trial court "erroneously denied [her] motion *in limine* (#2) which sought to exclude any evidence or argument regarding negligence or the standard of care." ***See id.*** at 15 (citation omitted). She states that "[t]he fact that [her] surgery was performed non-negligently and/or within the standard of care was repeatedly highlighted in defense counsel's opening and closing arguments. This was an abuse of discretion and error of law since it is well established that negligence concepts are irrelevant in a consent or informed consent case." ***Id.*** (citation omitted). Additionally, she says that "it suggested to the jury that lack of negligence could be a defense to lack of consent." ***Id.*** In particular, she claims that "the jury may have applied a 'so what' standard, reasoning that since the doctor was not negligent, the lack of informed consent was harmless. The injection of negligence concepts may have led the jury to lose sight of the central question pertaining to whether the doctor obtained informed consent." ***Id.*** at 23.

The trial court explained why it denied Ms. Cunningham's motion *in limine* to exclude negligence evidence in the first place, as follows:

> [T]his trial court sustained [Dr. Picardo's] objection and denied said [m]otion *in [l]imine* to avoid counsel claims of "back dooring" negligence concepts into this case. In the instant case, this trial court favored a "wait and see" attitude to ensure no counsel admitted negligence evidence in this alleged medical battery case.

\*\*\*

> When [Ms. Cunningham's] counsel argued said [m]otion *in [l]imine* regarding negligence concepts, [her] counsel did not argue negligence was not an issue based upon the facts presented.[6] [Ms. Cunningham's] counsel argued, based upon an alleged lack of consent, a battery had occurred, and [Dr. Picardo] caused [Ms. Cunningham's] alleged disfigurement in an area which was not being operated upon. As such, [Dr. Picardo's] counsel objected to this [m]otion *in [l]imine* due to his concern [Ms. Cunningham's] counsel was "going to back door a standard of care case, because their whole case is around this allegedly improperly removed piece of [Ms. Cunningham's] labia." In fact, as a precaution, [Dr. Picardo's] counsel had an expert available during trial to testify to standard of care if [Ms. Cunningham] raised this issue at the trial. Similarly, as a precaution, this trial court chose a "wait and see" attitude to ensure no counsel admitted negligence evidence in this alleged medical battery case. During the trial, no negligence evidence was presented or admitted. Since no negligence evidence was introduced into this case, this issue as to [Ms. Cunningham's] [m]otion *in [l]imine* is rendered moot and, therefore, lacks merit.

Trial Court Opinion (TCO), 6/13/19, at 3-4 (internal citation omitted).

While no negligence evidence was admitted at trial, Ms. Cunningham nevertheless takes issue with the following comments pertaining to negligence made by defense counsel in her opening and closing statements. During the defense's opening statement, defense counsel asserted:

> I'm going to talk with you a little bit about what the evidence will show, but before talking about what the evidence will show[,] I'm going to tell you what it will not show. And [Ms. Cunningham's] attorney touched on this a little bit, and that was his indication, you know, that this isn't -- you don't have to make any determination about the surgery being done wrong or anything

---

[6] Based on our review, the record does not support this assertion. The record shows that Ms. Cunningham had argued that "[t]his is not a negligence case, this is a consent case[,]" and insisted that "[i]t's not at all about the standard of care." N.T. Status Conference, 3/6/19, at 53, 54.

- 14 -

like that in order to prove the case.[7] **Well, the reality is that there will be no criticism whatsoever of Dr. Picardo's skill, of her judgment, of her recommendations. There will be no criticism of her surgical technique. There will be no criticism of any decisions she made in treating [Ms. Cunningham]. And that's important, because you can assume that her treatment was therefore within the standard of care and appropriate.** The only question in this case is whether she treated [Ms. Cunningham] without her consent.

***See also*** Ms. Cunningham's Brief at 19 (citing N.T. Trial, 3/13/19, at 32; emphasis added in brief). In the defense's closing statement, defense counsel argued:

[Ms. Cunningham's attorney] stood up here and told you at the beginning of the case that he wasn't going to criticize [Dr.] Picardo's competency, that this isn't an allegation that she didn't use the standard of care, those are not the issues in this case. Well, if those aren't issues in this case, why are we talking about qualifications again? Why are we talking about her experience with that when she disclosed her experience as it related to that gland? To suggest that she wasn't experienced enough -- and he said that in his opening, she was a young doctor, she wasn't all that experienced with surgery.[8] That's standard of care. If

_____

[7] During his opening statement, Ms. Cunningham's counsel said:

Importantly, there's no requirement to prove one way or the other whether the surgery was done correctly or wrongly, good or bad. That isn't an element in this case. It's not something that we're going to try to prove.

N.T. Trial, 3/13/19, at 20.

[8] For context, in Ms. Cunningham's opening statement, her counsel stated that "in roughly 2010[,] Dr. Carla Picardo was a fairly young obstetrician-gynecologist in Erie. She was working part time. She had at that point in her career fairly limited surgical experience." N.T. Trial, 3/13/19, at 21. Ms. Cunningham then advanced a theory at trial that Dr. Picardo intentionally did not tell Ms. Cunningham that she would be the lead surgeon because, as a

you're … going to pursue a case like that, we're not having the same kind of discussion that we're having in front of you.

My only reason for bringing that up, **I told you at the beginning, you are to assume this surgery was performed perfectly. It was performed within the standard of care. There is no question as to her skill, her judgment, her surgical technique, known [*sic*] of that is at issue. Because if it was, you would have heard from an expert witness who would have offered opinions that she didn't do those things properly and that caused injury.** The only question in front of you is whether Dr. Picardo obtained her consent for this surgery.

Ms. Cunningham's Brief at 20 (citing N.T. Trial, 3/14/19, at 103-04; emphasis added in brief).

Regarding these references to standard of care in defense counsel's opening and closing statements, the trial court determined that Ms. Cunningham had waived this claim by failing to make a timely objection at trial. TCO at 4. Nevertheless, even if not waived, the trial court concluded that this claim lacked merit as "no negligence evidence was admitted." *Id.* at 6. Moreover, it reasoned that:

To the extent [Dr. Picardo's] counsel mentioned "standard of care" in her opening and closing arguments, this trial court's reading to this jury the following standard jury instructions adequately conveyed to the jury the understanding that argument by either

_____

young surgeon, she wanted to obtain more surgical experience and feared that Ms. Cunningham would not consent if she told her she would be in charge of her surgery. *See id.* at 30 ("What we will prove to you is that Dr. Picardo betrayed [Ms. Cunningham's] trust, she exploited her vulnerability when she was under anesthesia, she made [Ms. Cunningham] an unwilling practice subject, she violated the law when she misled [Ms. Cunningham] about who was going to be performing the surgery. [Ms. Cunningham is] disfigured, she is uncomfortable with this disfigurement."); *id.* at 90 (Ms. Cunningham's counsel: "Did you intentionally not tell [Ms. Cunningham] that you were going to be the lead because you feared she might hesitate to consent and you wouldn't get the chance to do this [surgery]?").

- 16 -

counsel was not evidence. Immediately before the opening statements of counsel, this trial court stated:

THE COURT: The trial will proceed in the following manner: First, the plaintiff's lawyer will make an opening statement to you. Next, the defendant's lawyer will make an opening statement. **An opening statement is not evidence but is simply a summary of what the lawyer expects the evidence will show. The opening statements are designed to highlight for you the disagreements and factual differences between the parties in order to help you judge the significance of the evidence when it is presented.**

Once the lawyers have made their opening statements, then each party is given an opportunity to present its evidence. Plaintiff goes first, because they [*sic*] have the burden of proof[,] which I will discuss in greater detail later. The plaintiff will present witnesses whom the lawyer for the defendant may cross-examine. Following the plaintiff's case[,] the defendant may present its evidence and plaintiff's lawyer may cross-examine their [*sic*] witnesses.

**After all the evidence has been presented, the lawyers will present to you closing arguments to summarize and interpret the evidence in an attempt to highlight the significant evidence that is helpful to their client's *[sic]* positions. As with opening statements, closing arguments are not evidence.**

[N.T. Trial, 3/13/19, at 6-7]. Since [Ms. Cunningham] waived the issue and this court instructed the jury that argument by counsel is not evidence, [this] issue lacks merit.

*Id.* at 6-7 (emphasis added; emphasis added by trial court omitted).

At the outset of our review, we address whether Ms. Cunningham has waived this issue by failing to object at trial. As she discerns, the trial court's ruling on her motion *in limine* allowed for 'discussion' pertaining to negligence and the standard of care. **See** Ms. Cunningham's Brief at 19 n.5; **see also** Order, 3/11/19, at 1 ("'Since Negligence Is Immaterial In A Consent Case,

There Should Be No Discussion Of Negligence Or The Standard Of Care' is hereby **DENIED**.") (emphasis in original). While we recognize that a motion *in limine* is a "device for obtaining rulings on the admissibility of *evidence* prior to trial[,]" *see **Northeast Fence & Iron Works, Inc. v. Murphy Quigley Co., Inc.***, 933 A.2d 664, 667 (Pa. Super. 2007) (emphasis added; citation omitted), Ms. Cunningham explains that she did not object to the defense's purportedly improper argument in light of this ruling. *See* Ms. Cunningham's Reply Brief at 12 ("The court's *in limine* ruling explicitly allowed the defense to admit evidence and/or argue that Dr. Picardo was not negligent. Therefore, at trial[, Ms. Cunningham's] counsel could neither reasonably object nor request a curative instruction to evidence or argument which had previously been deemed admissible by the pre-trial ruling of the court."). Under Pennsylvania Rule of Evidence 103, "[o]nce the court rules definitively on the record--either before or at trial--a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Pa.R.E. 103(b). Here, despite saying in its Rule 1925(a) opinion that it was taking a 'wait and see' approach with this issue, the trial court definitively denied Ms. Cunningham's motion *in limine* regarding negligence, or at least appeared to do so in its order. Consequently, we decline to deem Ms. Cunningham's argument waived on the basis that she did not renew her objection regarding the 'discussion' of negligence at trial.

Therefore, we proceed to review the merits of Ms. Cunningham's claim. Though she states that we should apply the standard of review relating to the

denial of a motion *in limine*, **see** Ms. Cunningham's Brief at 3, no *evidence* of

negligence was admitted at trial.[9]  Instead, the crux of her issue concerns the

purportedly prejudicial remarks made by Dr. Picardo's counsel during her

opening and closing statements, which we have set forth *supra.*  For such

claims, we apply the following standard of review:

> The grant of a new trial because of counsel's improper remarks is within the discretion of the trial court.  **Stevenson v. Pennsylvania Sports and Enterprise, Inc.**, … 93 A.2d 236 ([Pa.] 1953); **Harvey v. Hassinger**, … 461 A.2d 814 ([Pa. Super.] 1983).  If the trial court determines that instructions to the jury to disregard the remarks are sufficient, an appellate court should be "reluctant to reverse since the trial judge is in a better position to see and understand the atmosphere of the trial and the effect the statement had on the jury." **Narcisco v. Mauch Chunk Twp.**, … 87 A.2d 233, 234 ([Pa.] 1952).  Whether the trial court abused its discretion in denying a new trial will be determined by "an examination of the remark made, the circumstances under which it was made and the precautions taken by court and counsel to remove its prejudicial effects."  **Id.** … at 234-[]35.  **See also Clark v. Hoerner**, 525 A.2d 377 ([Pa. Super.] 1987).

**Hill v. Reynolds**, 557 A.2d 759, 765-66 (Pa. Super. 1989).

We agree with Ms. Cunningham that a surgery without a patient's

consent is a battery, and that negligence principles generally do not apply to

such matters.  Indeed, our Supreme Court has explained:

> "It has long been the law in Pennsylvania that a physician must obtain informed consent from a patient before performing a surgical or operative procedure." **Morgan v. MacPhail**, … 704 A.2d 617, 619 ([Pa.] 1997), citing **Sinclair v. Block**, … 633 A.2d

---

[9] Ms. Cunningham does not complain of any specific testimony or other evidence admitted at trial regarding negligence or standard of care.  **See** Ms. Cunningham's Brief at 15-24 (complaining only of statements made in defense counsel's opening and closing statements).

1137 ([Pa.] 1993); ***Gray v. Grunnagle***, … 223 A.2d 663 ([Pa.] 1966).

> The informed consent doctrine requires physicians to provide patients with "material information necessary to determine whether to proceed with the surgical or operative procedure or to remain in the present condition." ***Sinclair***[,] 633 A.2d [at] 1140…. We have on several occasions defined the nature of this "material information." We have stated that the information provided by a physician must give the patient "a true understanding of the nature of the operation to be performed, the seriousness of it, the organs of the body involved, the disease or incapacity sought to be cured, and the possible results." ***Gray***[,] 223 A.2d [at] 674…. Thus, a physician must "advise the patient of those material facts, risks, complications and alternatives to surgery that a reasonable person in the patient's situation would consider significant in deciding whether to have the operation." ***Gouse v. Cassel***, … 615 A.2d 331, 334 ([Pa.] 1992). A claim that a physician failed to obtain the patient's informed consent sounds in battery. ***Id.***; ***see also Morgan***[, ***supra***].

***Duttry v. Patterson***, … 771 A.2d 1255, 1258 ([Pa.] 2001)…. As this Court has emphasized, the informed consent doctrine derives from the very fact that surgical or operative procedures, if not consented to, amount to a battery:

> The rationale underlying requiring informed consent for a surgical or operative procedure and not requiring informed consent for a non-surgical procedure is that the performance of a surgical procedure upon a patient without his consent constitutes a technical assault or a battery because the patient is typically unconscious and unable to object.

***Morgan***…, 704 A.2d at 620, citing ***Gray***…, 223 A.2d at 668-69. ***See also Gouse***…, 615 A.2d at 334 ("Lack of informed consent is the legal equivalent to no consent; thus, the physician or surgeon who operates without his patient's informed consent is liable for damages which occur, notwithstanding the care exercised[.]").

Thus, this Court has made clear on repeated occasions over a period of several decades that a claim based upon a lack of informed consent involves a battery committed upon a patient by a physician, an action which is distinct from a claim of a

consented-to, but negligently performed, medical treatment. Since surgery performed without a patient's informed consent constitutes a technical battery, negligence principles generally do not apply. It follows, of course, that a claim involving a surgical procedure performed without any consent at all by the patient, … also sounds in battery, and negligence requirements have no bearing on the matter. Indeed, a claim concerning the lack of consent for surgery can be maintained even where there is no allegation of negligence in the actual performance of the procedure. While negligence claims and informed consent claims often co-exist in the same tort action, they need not do so. A lack of informed consent or a lack of consent claim is actionable even if the subject surgery was properly performed and the overall result is beneficial.

*Montgomery v. Bazaz-Sehgal*, 798 A.2d 742, 748-49 (Pa. 2002) (emphasis omitted).

Based on the foregoing, we agree with Ms. Cunningham that negligence principles generally do not apply to informed consent cases. However, we reiterate that Ms. Cunningham does not complain of any specific testimony or other evidence admitted at trial regarding negligence or standard of care. Moreover, Dr. Picardo persuasively observes that:

[I]n her [c]omplaint, [Ms. Cunningham] indicated that she suffered medical damages as a result of the surgery performed by Dr. Picardo. For instance, in [p]aragraph 34 of the [c]omplaint, [Ms. Cunningham] alleges "as a consequence of the surgery performed by Dr. Picardo, [Ms. Cunningham] has suffered painful and severe injuries, which include, but are not limited to post-surgical pain; disfigurement; and discomfort." [Ms. Cunningham] further alleged in [p]aragraph 37 of her [c]omplaint[] the following: "As a result of the aforementioned injuries, [Ms. Cunningham] has undergone, and in the future, will undergo great physical and mental suffering, a great inconvenience in carrying out her daily activities, loss of life's pleasures and enjoyment, and claim in (*sic*) made therefore." [Ms. Cunningham] continued to allege in paragraphs 38 and 39 that "she sustained lost time from work, and lost opportunities, in addition to her persistent pain, limitations, and/or disfigurement, and therefore, avers that her

injuries may be of a permanent nature, causing residual problems for the remainder of her lifetime and claim is therefore."

[Ms. Cunningham] argued that, based upon an alleged lack of informed consent, a battery occurred, thus causing injuries including disfigurement by an alleged improper removal of a portion of [Ms. Cunningham's] labia. [Ms. Cunningham's] contention that her disfigurement occurred in an area of her anatomy allegedly not contemplated by Dr. Picardo's surgery[] is tantamount to a suggestion that the surgery was not performed properly; otherwise, the unexpected injury would not have occurred, particularly in an area which was not being operated upon. [Dr. Picardo] therefore objected due to concern that [Ms. Cunningham's] damage claim might imply or suggest that the surgery was performed improperly.

Dr. Picardo's Brief at 16-18 (internal citations omitted).

As discerned by Dr. Picardo, Ms. Cunningham's claim that her labia — on which Dr. Picardo did not operate — had changed shape and become disfigured from the surgery created a strong implication that Dr. Picardo did not perform the surgery properly. Under such circumstances, defense counsel's comments in her opening and closing statements that the jury could assume that Dr. Picardo's treatment was within the standard of care and appropriate do not strike us as improper nor prejudicial enough to warrant a new trial. Further, in both statements that Ms. Cunningham complains of, defense counsel immediately thereafter expressed to the jury that the "only question" before it was whether Dr. Picardo treated Ms. Cunningham without her consent. *See* N.T. Trial, 3/13/19, at 32 ("The only question in this case is whether she treated [Ms. Cunningham] without her consent."); N.T. Trial, 3/14/19, at 104 ("The only question in front of you is whether Dr. Picardo obtained her consent for this surgery."). By making such remarks, defense

counsel justifiably sought to convey to the jury that standard of care was not at issue, and the singular question for them to resolve was the matter of consent. Furthermore, as the trial court observed *supra*, it instructed the jury that opening and closing statements were not evidence. **See, e.g.**, **Commonwealth v. Cash**, 137 A.3d 1262, 1280 (Pa. 2016) ("It is well settled that the jury is presumed to follow the trial court's instructions….") (citation omitted). Accordingly, we conclude that the trial court did not err or abuse its discretion in determining that the at-issue remarks by defense counsel do not warrant a new trial.

## Issue 2

In Ms. Cunningham's second issue, she states that the trial court "erred as a matter of law and abused its discretion when it failed to instruct the jury that a doctor must inform a patient of all material 'facts' from which she can make an intelligent choice as to her course of treatment. Instead, the trial court limited the required information to material 'risks' of surgery." **See** Ms. Cunningham's Brief at 12-13. She says that the trial court "denied [her] proposed jury instructions numbered 4, 5, 8, 12, 16, and 18, among others, and failed to give any instruction similar thereto." **Id.** at 25 (footnote omitted). Ms. Cunningham claims that "[t]hese instructions supported the core of [her] case which was based on the fundamental legal proposition that a patient has the right to 'all material facts' from which she can make an 'intelligent choice as to her course of treatment' and that a patient has the right to choose the identity of her surgeon." **Id.** (citations omitted). Further,

she argues that, by denying her proposed instructions, "the trial court usurped the role of the jury[,] which is to determine what 'facts' are 'material' to a patient in deciding whether to undergo surgery." *Id.* at 13.

> We apply the following standard of review to such claims:
>
> Our standard of review regarding jury instructions is limited to determining whether the trial court committed a clear abuse of discretion or error of law which controlled the outcome of the case. Error in a charge occurs when the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. Conversely, a jury instruction will be upheld if it accurately reflects the law and is sufficient to guide the jury in its deliberations.
>
> The proper test is not whether certain portions or isolated excerpts taken out of context appear erroneous. We look to the charge in its entirety, against the background of the evidence in the particular case, to determine whether or not error was committed and whether that error was prejudicial to the complaining party.
>
> In other words, there is no right to have any particular form of instruction given; it is enough that the charge clearly and accurately explains the relevant law.

*Pledger by Pledger v. Janssen Pharmaceuticals, Inc.*, 198 A.3d 1126, 1146 (Pa. Super. 2018) (citations omitted).

Before addressing Ms. Cunningham's sub-issues, we set forth, in relevant part, the trial court's jury instruction pertaining to informed consent:

> In this case, the plaintiff has the burden of proving the following claims: Number one, Dr. Picardo performed an operation on plaintiff without her informed consent; number two, this procedure was the cause in bringing about the harm or damages as alleged; and number three, the extent of damages caused by the procedure.
>
> A physician must obtain a patient's consent to surgery. Patient's consent must also be informed. A patient cannot make an informed decision unless the physician explains the risks that a reasonably prudent patient would need to know to make an

informed decision and the alternative choices.  This is called informed consent.  A patient must have been given a description of the proposed medical procedure or treatment and have been informed about the risks of the procedure or treatment.  The patient must also be informed of the viable alternatives a reasonable person would consider important to know in order to make an informed decision about whether or not to undergo the procedure, treatment, or operation.

The physician who is responsible for the performance of the surgery cannot delegate to others her duty to provide sufficient information to obtain the patient's informed consent.  The physician must personally satisfy this obligation through direct communication with the patient.

The patient is not required to prove she would have made a different choice had the information been disclosed.  The patient must only prove the information not given to her would have been a substantial factor in her decision to consent to the procedure or treatment.  The physician is responsible whether or not the defendant physician intended to harm the plaintiff.

Informed consent requires direct communication between physician and patient and contemplates a back and forth face-to-face exchange.

N.T. Trial, 3/14/19, at 146-47.

*Proposed Jury Instruction #8*

To begin, Ms. Cunningham contends that the trial court erred when it rejected her Proposed Jury Instruction #8, which stated the following:

#8.  The primary point of informed consent is that the patient is informed of **all the material facts** from which she can make an intelligent choice as to her course of treatment.  ***Shinal v. Toms***, 162 A.3d[] 429, 453 (Pa. 2017).

Ms. Cunningham's Brief at 26 (citations omitted; emphasis in brief).  Ms. Cunningham argues that the trial court "erroneously rejected the common law based 'material facts' charge ([Ms. Cunningham's] Proposed #8) and substituted the more limiting 'material risks' charge found at [Pennsylvania

- 25 -

Suggested Civil Jury Instruction ("SSJI")] 14.90." *Id.* (citations omitted).[10] She asserts that SSJI 14.90 "is predominantly applicable in cases where a physician fails to warn a patient of potential surgical complications. No such claim was made here." *Id.* at 30. Instead, she says that "[her] claim was based on the fact that she agreed to Dr. Stull['s] performing her surgery, not Dr. Picardo. SSJI 14.90 was, for the most part, inapplicable to [Ms. Cunningham's] claim." *Id.* She maintains that "[t]he court erred by failing to permit the jury to consider whether any other information, such as the identity of the lead surgeon or the qualifications of that surgeon, might be a material fact that the jury could determine as relevant to a reasonable patient." *Id.* at 40 (citations omitted).

The trial court explained that it denied Ms. Cunningham's Proposed Jury Instruction #8 because it provided the jury with the relevant portion of SSJI 14.90, and with part of Ms. Cunningham's Proposed Jury Instruction #6, which set forth that "[i]nformed consent requires direct communication between physician and patient and contemplates a back and forth fac[e]-to-face exchange." *See* TCO at 12 (citations omitted). It reasoned that the instruction "was properly read to this jury to apply to the facts as the jury found them." *Id.* at 13.

---

[10] SSJI 14.90 is contained in the trial court's above-stated jury instruction beginning at "A physician must obtain…[,]" through the paragraph starting with "The patient is not required to prove…."

We discern no abuse of discretion or error of law that controlled the outcome of the case. Ms. Cunningham contends that SSJI 14.90 is too limiting and does not apply to her claim regarding the identity of her 'primary' or 'lead' surgeon. However, as Dr. Picardo points out "there was no testimony offered that there is such a thing as a 'primary' or 'lead' surgeon. The only testimony on this terminology was offered by the only witness competent to testify on the subject, Dr. Picardo." Dr. Picardo's Brief at 28. At trial, Dr. Picardo testified:

> We don't say I'm the lead surgeon. We don't go into formalities of titles with patients when we consent them. We say this is what we're going to do, these are the people who could be there. We don't say this person's doing this, this person's lead, this person's -- that's not a typical conversation I have with any patients. It's not necessarily the formality of consent.

N.T. Trial, 3/13/19, at 80. She later expounded that:

> Having the consent process with [Ms. Cunningham], I could -- by being, again, the lead surgeon, the lead surgeon -- you're using the word lead surgeon, because we don't use that term. It's the attending surgeon, which means the responsible surgeon, and I took responsibility for everything leading up and afterwards.
>
> When the consent is signed, in my mind, again, I didn't know who was going to be doing what part of the surgery because … once you get into surgery, then you sort of see what's going on. In my mind, Dr. Stull was there to potentially remove the Bartholin's gland if I had difficulty finding it or I wanted a second pair of eyes to make sure I had the right area. Because, again, the Bartholin is so small it's hard to find. I wanted to make sure it was done properly, and that would have meant Dr. Stull may have taken over that part of the surgery, whatever I felt was safest.

*Id.* at 84. According to Dr. Picardo, "[she] testified that she was the attending physician, and as such, she and only she was solely responsible for obtaining

- 27 -

the patient's informed consent." Dr. Picardo's Brief at 28; ***see also*** N.T. Trial, 3/13/19, at 73 ("[Y]ou don't use the word lead, you use the word attending, which was a lot of meaning what that entails."); ***id.*** at 78 ("There's the attending, or the responsible, surgeon, which was me, because I did everything that the attending[,] responsible surgeon would do. And Dr. Stull was my assistant, but as an assistant[,] she basically could do a lot or a little of the surgery.").

Ms. Cunningham did not introduce evidence to counter Dr. Picardo's testimony and demonstrate that a 'lead' or 'primary' surgeon exists in the medical community. Given the lack of proof that 'lead' or 'primary' surgeons exist, we do not agree with Ms. Cunningham that the court erred by failing to permit the jury to consider whether she should have been informed of her 'lead' or 'primary' surgeon.[11] Accordingly, against the backdrop of evidence

---

[11] Ms. Cunningham argues that "it is up to the jury, not the court, to determine what information a reasonable patient would find 'material' in order to make an intelligent choice as to her course of treatment." Ms. Cunningham's Brief at 38 (citing ***Festa v. Greenberg***, 511 A.2d 1371, 1377 (Pa. Super. 1986); ***Cooper v. Roberts***, 286 A.2d 647, 651 (Pa. Super. 1971)). However, in ***Festa***, this Court determined that "[a]lthough expert medical testimony is not mandatory to set forth the scope of a physician's duty to disclose material risks to a patient under the reasonable man standard, we conclude that such testimony is required to establish the existence of risks in a specific medical procedure, the existence of alternative methods of treatment and the existence of risks attendant with such alternatives." ***Festa***, 511 A.2d at 1376 (emphasis omitted). Similarly, we conclude that expert testimony is necessary to establish that a 'lead' or 'primary' surgeon exists. Only after that existence is established may a jury determine if such information would be material to a reasonable patient in making an intelligent choice as to treatment.

adduced at trial in this matter, we do not conclude that trial court committed a clear abuse of discretion or error of law which controlled the outcome of the case by denying Ms. Cunningham's Proposed Jury Instruction #8.

*Proposed Jury Instructions #5 and #12*

Next, Ms. Cunningham challenges the trial court's rejection of her Proposed Jury Instructions #5 and #12, which provide the following:

> #5.  For consent to be effective, it must be informed and knowledgeable.  In order for consent to be informed, there must be a clear understanding by both parties of "the **nature of the undertaking** and what the possible, as well as expected, results might be."  ***McSorely v. Deger***, 905 A.2d 524, 528 (Pa. Super. 2006).

> #12.  "Informed consent is the product of the physician-patient relationship.  The patient is in the vulnerable position of entrusting his or her care and well-being to the physician based upon the physician's education, training, and expertise.  **It is incumbent upon the physician to cultivate a relationship with the patient and to familiarize himself or herself with the patient's understanding and expectations**…[.]  Only by personally satisfying the duty of disclosure may the physician ensure the consent truly is informed."  ***Shinal***…, 162 A.3d at 453-[]54.

Ms. Cunningham's Brief at 41 (emphasis in brief; some citations omitted).

Ms. Cunningham argues that "[t]he informed consent doctrine does not require a doctor to perform a sterile administrative checklist, but rather embraces the concept of a two-way flow of essential information arising out of the physician-patient relationship."  ***Id.*** at 40 (citation omitted).  Ms. Cunningham states that she "requested a jury instruction conveying this concept to the jury in the form of [her] Proposed Jury Instruction[s] #5 and #12."  ***Id.*** at 41.  She claims these instructions were necessary because Dr.

Picardo did not communicate her understanding of the surgery to Ms. Cunningham, and did not understand Ms. Cunningham's concept of the operation. **See id.** at 44. According to Ms. Cunningham, her Proposed Jury Instructions #5 and #12 "would have clarified that informed consent extends beyond SSJI 14.90's risks, alternatives and description[,] requiring a doctor to ensure 'a clear understanding by both parties of the nature of the undertaking' … and 'to familiarize himself or herself with the patient's understanding and expectations'…." **Id.** at 45.

The trial court rejected both instructions on the basis that SSJI 14.90 adequately stated the relevant law and provided the necessary guidance for the jury to apply to the facts it found. **See** TCO at 11, 14. We agree. SSJI 14.90 sufficiently imparts that the doctor must directly communicate and discuss the proposed medical procedure with the patient. Further, we observe that the trial court read Ms. Cunningham's Proposed Jury Instruction #6, which stated that "[i]nformed consent requires direct communication between physician and patient and contemplates a back and forth fac[e]-to-face exchange." TCO at 12 (citations omitted). We also reiterate that "there is no right to have any particular form of instruction given; it is enough that the charge clearly and accurately explains the relevant law." **See Pledger**, **supra.** Accordingly, no relief is due.

*Proposed Jury Instruction #4 and #16*

Ms. Cunningham next complains that the trial court improperly rejected her Proposed Jury Instructions #4 and #16, which state:

#4. A patient may specifically limit his or her consent to an invasive medical procedure to a **particular surgeon**. ***Taylor v. Albert Einstein Medical Center***, 723 A.[2]d 1027, 1034 (Pa. Super. 1998)[12]; ***Grabowski v. Quigley***, 684 A.2d 610, 617 (Pa. Super. 1996) ("If the patient is not informed as to the identity of the operating surgeon, the situation is a [`]ghost surgery[.']").

#16. "**The patient is entitled to choose his own physician and he should be permitted to [agree to] or refuse to accept [a] substitution**…[.] The patient is entitled to the services of the particular surgeon with whom he or she contracts…[.] If the surgeon employed merely assists the … other physician in performing the operation, it is the … other physician who becomes the operating surgeon. If the patient is not informed as to the identity of the operating surgeon, the situation is an [impermissible] 'ghost surgery'." ***Taylor***, [723 A.2d] at 1036; ***Grabowski***, [684 A.2d] at 617.

Ms. Cunningham's Brief at 46, 49 (emphasis in brief; citations omitted).

Ms. Cunningham argues that "by refusing to give [her] Proposed Jury Instructions #4 and #16, the trial court … erroneously ruled that the identity of the surgeon who was to perform the procedure was irrelevant to the issue of informed consent." ***Id.*** at 56. Further, she says that, "[a]s a result of the denial of both #4 and #16, the defense was able to argue that the division of labor during surgery is none of the patient's business, [and] that this information is never relayed to the patient, nor should it be." ***Id.*** at 49-50 (citations omitted). She contends that "[t]he trial court's failure to instruct the jury as to [her] Proposed Jury Instructions #4 and #16 was a reversible error of law which controlled the outcome of the case." ***Id.*** at 57.

---

[12] We note that our Supreme Court reversed in part this decision on other grounds in ***Taylor v. Albert Einstein Medical Center***, 754 A.2d 650 (Pa. 2000).

In denying Ms. Cunningham's Proposed Jury Instructions #4 and #16, the trial court explained:

> Both the **Taylor** and **Grabowski** cases involved factually different situations from the instant case. In **Taylor**, the patient's mother alleged she had given consent to perform invasive surgery to Dr. Wertheimer, not to Dr. Trinkaus. In fact, when Dr. Trinkaus was specifically asked by the patient's father who would perform [the] surgery, Dr. Trinkaus unequivocally stated Dr. Wertheimer would perform the catheterization. However, Dr. Trinkaus performed the catheterization with Dr. Wertheimer's assistance.[13] In **Grabowski**, [the] patient sued three physicians for battery, medical malpractice, breach of oral contract, and vicarious liability. [The p]atient alleged [that the] first physician agreed to perform herniated disc surgery; [the] second physician actually performed [the] majority of surgery due to [the] first physician's unavailability; and a third physician instructed [the] second physician to perform surgery. The consent form which [the patient] signed stated surgery would be "performed under the direction of Dr. Quigley, *et al*[."] [The patient] testified "*et al*[,]" which was handwritten, looked to him like "ETOL[,"] and that the patient did not know what those words meant until his counsel explained them to him at a deposition. Moreover, the records in **Grabowski** reflected [that] the first physician who obtained the informed consent was unavailable for the procedure so he delegated to a second physician, unknown to the patient, who performed the bulk of the surgery. The first surgeon was not even on the premises but was in another county at the time the patient was placed under anesthesia. In the instant case, clearly all three surgeons' names are listed on the [i]nformed [c]onsent [f]orm

_____

[13] Dr. Picardo adds that **Taylor** "involved two surgeons having the informed consent discussion with the [p]laintiff, and the [p]laintiff consenting to the surgery by the more experienced surgeon. In this case…, it is undisputed that only Dr. Picardo held the informed consent discussion with [Ms.] Cunningham. Dr. Stull never spoke with [Ms. Cunningham] at any time prior to the surgery." Dr. Picardo's Brief at 31-32. We also observe that there was no written consent form in **Taylor**, and we reiterate that the patient's mother in that case alleged that she had given consent to perform the invasive procedure **only** to the more experienced surgeon and **not** to the lesser experienced surgeon who actually performed the surgery. **Taylor**, 723 A.2d at 1031, 1034, 1036.

that [Ms. Cunningham] signed after discussing this form with [Dr. Picardo]. [Dr. Picardo] did not delegate to another surgeon to perform this surgery. Therefore, this trial court read to this jury [SSJI] 14.90 … and instructed the jury as follows:

> THE COURT: The physician who is responsible for the performance of the surgery cannot delegate to others her duty to provide sufficient information to obtain the patient's informed consent. The physician must personally satisfy this obligation through direct communication with the patient.

[N.T. Trial, 3/14/19, at 146-47]. ***See also*** [***id.*** at 138-60].

With the trial court's reading of all the given jury instructions, and specifically [SSJI] 14.90…, the jury in the instant case was properly and adequately informed that the physician who is responsible for the procedure must be the physician who obtained the patient's informed consent. Moreover, … after [Dr. Picardo] discussed the [i]nformed [c]onsent form with [Ms. Cunningham], [Ms. Cunningham] signed the [i]nformed [c]onsent form with all three surgeons — Dr. Picardo, Dr. Stull, and Dr. Tseng — listed near the top of the form. Dr. Picardo and Dr. Stull then performed the surgery on [Ms. Cunningham]. The jury in the instant case found Dr. Picardo obtained informed consent from [Ms. Cunningham] to perform this surgery; therefore, this trial court did not "circumscribe the jury's duty by limiting any material or relevant facts" with this jury instruction which provides the law, not facts.

TCO at 9-10 (formatting slightly modified); ***see also id.*** at 15-16.

Ms. Cunningham has not convinced us that the trial court committed an error of law or abuse of discretion. We agree with the trial court that ***Taylor*** and ***Grabowski*** are distinguishable. Unlike the circumstances in ***Taylor*** and ***Grabowski***, the issue here is not whether Dr. Stull obtained consent and then, without Ms. Cunningham's permission, delegated the surgery to Dr. Picardo or allowed Dr. Picardo to substitute for her. Instead, the issue here is whether Dr. Picardo obtained Ms. Cunningham's informed consent to perform the

surgery, which presented a factual dispute for the jury to decide, largely based upon how it reconciled the differing accounts of the January 26, 2011 conversation between Dr. Picardo and Ms. Cunningham about the surgery.[14] Further, to the extent Ms. Cunningham complains that because the trial court denied her Proposed Jury Instructions #4 and #16, the defense could argue that physicians never relay the division of labor to patients, we repeat that Ms. Cunningham produced no evidence at trial to the contrary. Thus, we determine that the trial court did not err and abuse its discretion in denying Ms. Cunningham's Proposed Jury Instructions #4 and #16. No relief is due on this basis.

## Issue 3

In Ms. Cunningham's third issue, she argues that the trial court erred "when it refused to instruct the jury that a patient must be correctly advised of the professional credentials, training and experience of her primary surgeon." Ms. Cunningham's Brief at 57 (unnecessary capitalization and

---

[14] *Cf.* N.T. Trial, 3/13/19, at 170-71 (Ms. Cunningham's recalling that Dr. Picardo asked her "if she could scrub in to be there") *with id.* at 79 (Dr. Picardo's stating that she thought it was "pretty obvious" that she would attend the surgery because "during the discussion about what would happen during the surgery, which is part of the consent, I use the words 'I' and 'we' typically. So we're going to make an incision here, we're going to then dissect down, go through the tissue until we find the gland…. And I would have explained everything in 'I' or 'we,' those terms, instead of Dr. Stull will do this, Dr. Stull will do that. Because if Dr. Stull were going to be the one taking the lead, then Dr. Stull both legally and also for [the] best care of the patient would take over the whole consent process").

emphasis omitted). Ms. Cunningham explains that her Proposed Jury Instruction #18, which set forth SSJI 14.100, provided that:

**INFORMED CONSENT – MISREPRESENTATION OF PHYSICIAN'S PROFESSIONAL CREDENTIALS, TRAINING OR EXPERIENCE**

A physician is required to obtain the patient's informed consent to proceed with surgery. A patient's consent is not informed if the physician knowingly misrepresents her professional credentials, training, or experience.

The patient is not required to prove that she would have chosen differently, had the physician disclosed her true credentials, training, or experience. The patient must prove only that the misrepresentation was a "substantial factor" in the decision whether or not to undergo the procedure or treatment.

A physician may not argue as a defense that a reasonable person would have agreed to undergo the procedure or treatment even had the physician disclosed her true credentials, training, or experience. What a reasonable person would have chosen to do is irrelevant. The patient has the right to choose.

Ms. Cunningham's Brief at 57-58 (citations omitted).

Ms. Cunningham contends that "[t]his case presents a unique situation. Here, Dr. Picardo did accurately provide her qualifications (*i.e.*[,] that she had never done the procedure before) and she did accurately provide Dr. Stull's qualifications (that Dr. Stull had done the procedure before and felt comfortable doing it on [Ms.] Cunningham)." *Id.* at 58. However, according to Ms. Cunningham, "Dr. Picardo then misled [Ms.] Cunningham as to which doctor would actually perform the procedure." *Id.* Ms. Cunningham claims that "[i]t defies logic to say that informed consent was satisfied where a patient was correctly informed of Dr. Picardo's lack of experience and correctly informed of Dr. Stull's ample experience, but then completely misled as to

which doctor was to perform the operation." *Id.* at 58-59.  She says that "[i]t cannot be that the law prohibits misrepresentation of a surgeon's credentials but allows misrepresentation of the identity of the surgeon." *Id.* at 59.

> The trial court explained why it denied this instruction as follows:

> [D]espite evidence indicating that Dr. Picardo did not misrepresent her personal credentials as to training and experience, [Ms. Cunningham] argued [that] Dr. Picardo misrepresented who would be the surgeon.  Additionally, no evidence was presented that Dr. Picardo misrepresented her "true" professional credentials, training, or experience.  Since [there was] no evidence of any misrepresentation by [Dr. Picardo], this jury instruction was not appropriate.  [Ms. Cunningham] also argued that she was "not accurately advised of the identity of the surgeon who would be performing the surgery on her."  Assuming *arguendo* this statement as true, this requested suggested standardized civil jury instruction is not proper or applicable as this instruction does not contemplate the type of misrepresentation alleged by [Ms. Cunningham].  [Ms. Cunningham's] issue as to [P]roposed [J]ury [I]nstruction #18 was properly denied and lacks merit.

TCO at 17.

We discern no abuse of discretion or error of law in the trial court's analysis.  As the trial court stated, Ms. Cunningham's Proposed Jury Instruction #18/SSJI 14.100 does not pertain to the type of misrepresentation alleged by Ms. Cunningham.  Accordingly, no relief is due on this basis either.

Judgment affirmed.

Judgment Entered.

- 36 -

Joseph D. Seletyn, Esq.
Prothonotary


Date:  3/27/2020