J-A18028-23

2023 PA Super 282

GEORGE OLAR, AN INDIVIDUAL      :    IN THE SUPERIOR COURT OF
                                         :           PENNSYLVANIA
            Appellant            :
                                           :
                                           :
             v.                       :
                                           :
                                           :
RONALD BENNETT                 :    No. 703 WDA 2022

Appeal from the Judgment Entered May 20, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-18-5590

CAROL LUTZ, AN INDIVIDUAL        :    IN THE SUPERIOR COURT OF
                                           :           PENNSYLVANIA
            Appellant            :
                                           :
                                           :
            v.                       :
                                           :
                                           :
RONALD BENNETT, AN INDIVIDUAL   :    No. 704 WDA 2022

Appeal from the Judgment Entered May 20, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-18-5591

BEFORE:  BENDER, P.J.E., LAZARUS, J., and KUNSELMAN, J.

OPINION BY LAZARUS, J.:                  **FILED: December 29, 2023**

George Olar (Olar) and Carol Lutz (Lutz)[1] (collectively Plaintiffs) filed this appeal[2] from the judgment, entered in favor of Defendant Ronald Bennett (Bennett), after the trial court denied Plaintiffs' motion for a new trial. Upon review, we conclude the evidence presented in this automobile accident case failed to establish a foundation for a sudden emergency instruction, and that Plaintiffs were entitled to their requested instructions on a driver's duty of care. Finding prejudicial error, we reverse and remand for a new trial.

On May 6, 2016, at approximately 11:30 p.m., Plaintiffs left a birthday party at the Fraternal Order of Owl's Nest 9051 (Owl's Nest), located on Little Deer Creek Valley Road in West Deer Township. They walked across Little Deer Creek Valley Road to return to their vehicle, which was parked in the lot across the road from the Owl's Nest. Little Deer Creek Valley Road is a two-lane roadway that runs north and south with a posted speed limit of 25 miles per hour (mph). The area is lit with streetlights lining the northbound lane, and ambient light from shops and business along the southbound lane, including the light from the Owl's Nest sign. Bennett, driving northbound on

---

[1] On July 25, 2023, this Court entered an order granting the motion to substitute Howard K. Lutz, Executor of the Estate of Carol Ann Lutz, Deceased, for Appellant Carol Lutz. **See** Order, 7/25/23.

[2] The Plaintiffs' cases were consolidated for trial. The appeals docketed at 703 WDA 2022 and 704 WDA 2022 were consolidated by this Court upon stipulation of the parties. **See** Order, 1/27/23. This Court's order provided that the appeal at 703 WDA 2022 would be designated the lead appeal, and all filings with this Court "shall be made at the lead docket number." **Id.**

Little Deer Creek Valley Road, struck the Plaintiffs with his minivan as they were crossing the road. Plaintiffs suffered serious injuries.

At trial, Plaintiffs testified that they left the Owl's Nest, looked in both directions and, seeing no traffic, entered the southbound lane of Little Deer Creek Valley Road and crossed the double yellow line. *See* N.T. Jury Trial, 3/1/22, at 267, 288-91, 313-14, 319, 323, 330, 334-35. In their depositions, which were read into the record at trial, Plaintiffs testified that they were on or near the berm of the road, at the entrance to the parking lot, when they were hit. *Id.* at 318, 328, 331, 333, 335-36. Lutz had no recollection of the accident, and Olar testified that he did not hear or see Bennett's vehicle "until the last second," "until it got close enough to me," when it was within about one or two feet. *Id.* at 290, 292, 335, 339-40.

Bennett testified that he was returning from work, driving northbound, that he was very familiar with that particular stretch of Little Deer Creek Valley Road, that he traveled it at least four to six times each month, that he knew the Owl's Nest was on left-hand side of the road, and that the parking lot was on the right. *Id.* at 117-18. Bennett stated that, on the night of the accident, he had a clear view for 400 feet in front of him, that he did not recall any vehicles behind him or coming toward him in the southbound lane, that he had his low-beam headlights on, that, if he thought he needed his high-beam lights to see, he would have put them on, and that he did not see anyone as he approached the crossing area between the Owl's Nest and the parking lot. *Id.* at 119, 121-23. Bennett testified that he knew the speed limit on that

stretch of roadway was 25 mph and that, immediately after the accident, he told a police officer that he estimated his speed at the time of the accident to be "between 25 and 30" mph; he also testified in his deposition that he was going "between 25 and 30" mph. *Id.* at 120. Bennett testified repeatedly that he did not see the pedestrians until he hit them, *id*. at 125, 130, 138, 151, 155, and acknowledged that Olar was wearing a white shirt. *Id.* at 138.

West Deer Township Police Officer Matthew Evan testified that he responded to the accident in front of the Owl's Nest on May 6, 2016, and that he took photographs at the scene. *Id.* at 84. He testified that there are streetlights overhanging the northbound lane of Little Deer Creek Valley Road, and there were parking lot lights across from the Owl's Nest, but that on the night in question one of the parking lot lights, which faced the parking lot, was not illuminated. *Id.* at 85-86. Officer Evan acknowledged that there was lighting in the area where the collision occurred and just north of where the accident occurred, and that there were no adverse weather conditions, but that the road surface may have been wet. *Id.* at 87-88. Officer Evan also stated that he was not aware of any obstructions "that would have prevented [Bennett] from seeing any pedestrians that might have been in either lane[.]" *Id.* at 94. With respect to his police report, Officer Evan testified as follows:

> Q: On the evening of this collision, did you get a statement from Mr. Bennett regarding whether or not he saw anything, he saw the [Plaintiffs]?
>
> A: I do recall from reviewing my report [that] when I spoke with Mr. Bennett[,] he stated that he did not see them.

Q: And did you ask him why he did not see them?

A: I do recall from reading my report that I did ask him that.

Q: And do you recall what his response was?

A: I think that he stated that he was not distracted, that it was probably in response to one of my questions, and that he just said, you know, with his lights and the way that the road was.

Q: Did he ever give you a reason as to why he was unable to see them?

A: I don't believe so.

*Id.* at 94-95. Additionally, with respect to lighting, Officer Evan stated that, to the best of his recollection, it was "very dark" in the area where the accident occurred. *Id.* at 96. Finally, Officer Evan stated that Bennett consented to a blood draw, which was completed and analyzed at the Allegheny County Crime Lab. The results of the test were negative for alcohol or drugs. *Id.* at 109.

Both Plaintiffs and Bennett provided expert testimony from accident reconstructionists. Plaintiffs' expert, Dan Connolly, testified that the pedestrians would have been visible at a distance of over 299 feet, and that when Plaintiffs entered the roadway, Bennett was approximately 185 feet from the crossing area if he were traveling at 30 mph. *Id.* at 238, 248-49; 555-56. Specifically, using the speed Bennett testified to, as well as the slowest and fastest walking speeds for people over 60 years of age, *id.* at 186,[3] Connolly reached a conclusion as to when the Plaintiffs could have been perceived in the roadway:

_____

[3] Both Plaintiffs were in their seventies at the time of the collision.

Q: So[,] I understand, then, all of those distances that you just testified to that you can perceive, react[,] and stop your vehicle are well within this 200-foot photograph that we're showing now?

A: That's correct.

Q: And your distances were, depending on his speed, if it was 25 or 30, he could stop his vehicle at 100 feet, 117 feet, 147 feet and at the outermost 160 feet?

A: That's correct.

*Id.* at 205. In his calculation, Connolly also considered "friction value," noting that there was some testimony that the roadway was wet, and some testimony that the roadway was dry. *Id.* at 204. Connolly further testified that the non-illuminated parking lot light, to which Officer Evan testified, would not have made an appreciable difference in the lighting or visibility on the roadway, as most of that light shines onto the parking lot area. *Id.* at 242-43, 249.

Defense expert, Gregory Sullenberger, testified that if Bennett were traveling at 30 mph, he would have been 182 feet from the crash site when the Plaintiffs entered the roadway. Sullenberger agreed with Connolly that Plaintiffs had walked 16 feet from the southbound fog line to the spot they were hit, and that the total distance between the east and west fog line was 21 feet. *Id.* at 184. Both experts agreed that if Bennett were traveling at 25 mph, he would have been 154 feet away from the crash site when the Plaintiffs entered the roadway. *Id.* at 190, 456. Sullenberger opined that Bennett was traveling at 24.2 mph. *Id.* at 397-98. He also stated that, in his opinion, the area of the accident was "dark." *Id.* at 407-08. Sullenberger disagreed with

Connolly's opinion as to when Plaintiffs would have been visible to Bennett (185 feet); in Sullenberger's opinion, Connolly's analysis did not take into account windshield tinting or "backlighting," i.e., the fact that Bennett was coming from a well-lit area to a lesser lit area. *Id.* at 411-14. In Sullenberger's opinion, Plaintiffs were 112 to 182[4] feet from Bennett when they entered the roadway and that the accident was "not avoidable." *Id.* at 418, 452-53, 456, 498. Sullenberger also acknowledged on cross-examination that his calculations were based on a speed of 25 mph, and he made no calculations using a 30-mph speed. *Id.* at 454.

The sole eyewitness, Michael Fouse, testified that he lived in an apartment building on Little Deer Creek Road, across from and south of the Owl's Nest. *Id.* at 255. He testified that he did not know the Plaintiffs. *Id.* at 256. Fouse stated that on the night of the accident, he was outside, standing on Little Deer Creek Road, looking north toward the Owl's Nest. *Id.* at 259. He further testified that he glanced over and saw Olar leave the Owl's Nest, that he was moving slowly, *id.* at 264, and when he looked back to the roadway, he saw Olar get hit by Bennett's vehicle. *Id.* at 262. Fouse testified that he did not hear any horns, skidding sounds, or screeching of brakes. *Id.* at 325-26.

---

[4] Sullenberger testified on direct examination that the range was 77 to 122 feet, but corrected his calculation on cross-examination, and on redirect, to 112 to 182 feet. *See* N.T. Jury Trial, at 418, 452-53, 456, 498.

At the conclusion of trial, the parties submitted points for charge.  The court refused to charge on Plaintiffs' requested points 2,[5] 3,[6] and 5,[7] which explained the legal duty of a motorist to keep a proper lookout ahead, to be attentive, and to exercise ordinary care under the circumstances then presenting.  Over Plaintiffs' objection, the court granted Bennett's request for a charge on the sudden emergency doctrine and denied Plaintiffs' requested points for charge.

Following trial, the jury found Bennett was not negligent and returned a verdict in his favor.  Plaintiffs filed timely post-trial motions, which were

_____

[5] "A driver has a duty to maintain a proper lookout and to observe what is occurring in front of his vehicle."  Plaintiffs' Point for Charge #2.

[6] "The duty to exercise ordinary care to keep a proper lookout involves not only the duty to look when such looking would be effective, but also the duty to see what an ordinarily prudent person, exercising ordinary care, would have seen under the circumstances then and there existing."  Plaintiffs' Point for Charge #3.

[7] "If a pedestrian, before being hit, has been on the highway for a long period of time so that a careful driver could see him and avoid the accident, and if the pedestrian is then hit, you may conclude that negligence has then been established on the part of the driver.  Whether or not that took place in this case will, like all the other facts, be for you to determine.  The operator of a vehicle is under a duty to be attentive, to discover the presence of a pedestrian in the highway ahead of him. He has an affirmative duty to observe pedestrians in his field of vision and to take precautions not to injure them. The Defendant's failure to see a pedestrian in his field of vision just before striking him is evidence of negligence."  Plaintiffs' Point for Charge #5.

argued and denied on May 13, 2022. On May 17, 2022, judgment was entered

in favor of Bennett. This timely appeal followed.[8]

Plaintiffs raise the following issues on appeal:

1. Did the court err in refusing to instruct the jury on the duties of a driver to maintain a proper lookout ahead, to see what an ordinary prudent person would have seen under the circumstances, and [that] failing to see pedestrians in his field of vision until impact may be evidence of negligence?

2. Did the court commit reversible error in instructing the jury to consider if Bennett was faced with a sudden emergency when there were no facts inferring a sudden, unexpected emergency existed at the time Bennett struck pedestrians Lutz and Olar?

Appellants' Brief, at 4.

Our standard of review regarding jury instructions is limited to determining whether the trial court committed a clear abuse of discretion or error of law[,] which controlled the outcome of the case. Error in a charge occurs when the charge as a whole is inadequate or not clear or has a tendency to mislead or confuse rather than clarify a material issue. Conversely, a jury instruction will be upheld if it accurately reflects the law and is sufficient to guide the jury in its deliberations.

The proper test is not whether certain portions or isolated excerpts taken out of context appear erroneous. We look to the charge in its entirety, against the background of the evidence in the particular case, to determine whether or not error was committed and whether that error was prejudicial to the complaining party.

In other words, there is no right to have any particular form of instruction given; it is enough that the charge clearly and accurately explains the relevant law.

---

[8] The trial judge filed an opinion on December 28, 2022. The court did not order Plaintiffs to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

*Pledger by Pledger v. Janssen Pharm., Inc.*, 198 A.3d 1126, 1146 (Pa. Super. 2018). "[W]e are mindful that a trial court is bound to charge only on that law for which there is some factual support in the record." *Levey v. DeNardo*, 725 A.2d 733, 735 (Pa. 1999) (citation omitted).

The trial court denied Plaintiffs' three requested points for charge, all of which essentially state a driver's duty to be attentive to what is occurring in front of his vehicle. The court reasoned that, given Bennett's testimony that he did not see Plaintiffs until he was upon them, these jury charges "would be more applicable during the day light." Trial Court Opinion, 12/28/22, at 4 (unpaginated). We disagree with this reasoning. A driver's duty of vigilance and attentiveness is required just as much, if not more, at night than in daylight. "[I]t is not the function of the trial court in charging a jury to advocate, but rather to explain the principles of law [that] are fairly raised under the facts of a particular case so as to enable the jury to comprehend the questions it must decide." *Lockhart v. List*, 665 A.2d 1176, 1179 (Pa. 1995).

We agree with Plaintiffs' argument that the purpose of the proposed instructions on a driver's duty of care was to explain to the jury that a motorist has a duty to be vigilant in watching the road ahead, and that striking pedestrians in his field of vision, if the jury were to find they were in his field of vision, is proof of negligence. Viewing the evidence of record and the charge as a whole, *see* N.T. Jury Trial, *supra* at 532-55, and acknowledging that the court instructed generally on the concept of negligence and

- 10 -

comparative negligence, as it related to both Plaintiffs and Bennett, *id.* at 532-36, and assured clear distance, *id.* at 544, we find that the court's failure to instruct the jury on a driver's duty of care precluded clarification of a material issue in this case. *See Pledger*, *supra*; *see also Graham*, *supra* at 165 (whether pedestrian might have avoided harm had he been more attentive to traffic bore only upon question of his contributory negligence, not upon what standard should be applied in assessing motorist's alleged failure to exercise reasonable care).

With respect to the charge on sudden emergency, the court reasoned that since Bennett's testimony "was the only evidence [of] what had occurred[,] the [c]ourt thought it more appropriate to instruct the [j]ury with respect to the sudden emergency doctrine as requested by [Bennett]." Trial Court Opinion, *supra* at 4. We disagree with this analysis as well.

> Pennsylvania tort law recognizes that sometimes injurious accidents are not caused by carelessness, but because events conspire to create a situation so urgent and unexpected that the person alleged to be blameworthy had little or no practical opportunity to avert the harm. When the evidence suggests that such "sudden emergencies" may have played a role in a case, the presiding judge may instruct a jury that, should it determine that such an emergency contributed to the accident, it should assess the defendant's performance commensurately. But since the advent of the automobile, Pennsylvania law also has imposed a heightened standard of care upon drivers to exercise particular vigilance when it is reasonably foreseeable that a pedestrian will cross their path, particularly at intersections.

*Graham v. Check*, 243 A.3d 153, 157 (Pa. 2020).

Here, the court described the sudden emergency doctrine as a "defense" for the driver, N.T. Jury Trial, **supra** at 544-45, which, in this context, is ill-advised. Night driving is not an emergency. A driver has an obligation to adjust his speed based upon road and weather conditions, *including visual obstructions*, to ensure his ability to react to foreseeable events. **See Lockhart**, **supra**; **see also** 75 Pa.C.S.A. § 3361 ("No person shall drive a vehicle at a speed greater than is reasonable and prudent under the conditions and having regard to the actual and potential hazards then existing, nor at a speed greater than will permit the driver to bring his vehicle to a stop within the assured clear distance ahead"); **id.** ("[E]very person shall drive at a safe and appropriate speed . . . when special hazards exist with respect to pedestrians or other traffic or by reason of weather or highway conditions."). Night driving is a form of visual obstruction, and here, particularly where Bennett testified that he was familiar with the area, including the crossing area for the Owl's Nest parking lot, the court should not have instructed on sudden emergency. **See Cannon v. Tabor**, 642 A.2d 1108, 1112 (Pa. Super. 1993) (at night, assured clear distance is scope of driver's headlights).

Our Supreme Court's decision in **Graham**, **supra**, is instructive.[9] There, Graham was crossing Route 30 just before 6:00 a.m. on March 8, 2016, in the Borough of East Pittsburgh, in a marked crosswalk.

---

[9] The trial court twice noted its disagreement with the decision in **Graham**. **See** N.T. Jury Trial, **supra** at 473, 478-79.

Observing the signal for cross-traffic was red, and after confirming that oncoming traffic from the south was stopping for the signal, Graham, who was wearing dark clothing, began his crossing in the marked crosswalk at an ordinary rate of speed. As Graham crossed, Larry Check was approaching the intersection on Route 30 from the north. From Graham's perspective as he crossed the highway, Check was traveling in the farthest of four lanes, but Graham did not see him during the first part of his crossing. Another car, driven by Joseph Millach, waited southbound in the third lane for the signal to change. The signal turned green when Graham had reached or was somewhat past Route 30's centerline, at least partially obscured from Check's view by Millach's car[,] as Check rolled toward the intersection on Millach's right side. Check was slowing for the signal, but the light turned green before he stopped, and Check began to accelerate, passing Millach and entering the intersection at between fifteen and thirty miles-per-hour. On the far side of the intersection, in the fourth lane from the bus stop, Check struck Graham with his car. Check testified that he applied the brakes as quickly as he could upon seeing Graham, but that he first saw Graham at a distance of only seven to ten feet. Check was unsure whether he began braking before or just after he struck and severely injured Graham with the left-front portion of his car. Graham testified that he did not see Check's car until just before it struck him.

*Id.* at 158. Graham filed a negligence suit against Check and, over Graham's objection, the court instructed the jury on the sudden emergency doctrine as follows:

In this case, Check claims he is not liable for Graham's harm because he faced a sudden emergency and responded reasonably according to the circumstances. In order to establish this defense, Check must prove to you all of the following:

1. Check faced a sudden emergency requiring immediate responsive action.

2. Check did not create the sudden emergency.

3. Check's response to the sudden emergency was reasonable under the circumstances.

- 13 -

4. Check must prove that defense by a preponderance of the evidence.

*Id.* at 159. The jury returned a verdict for the defense, and Graham appealed to this Court, which found no error in the charge. Our Supreme Court reversed, explaining that

> [t]he sudden emergency doctrine . . . is available as a defense to a party who suddenly and unexpectedly finds him or herself confronted with a perilous situation which permits little or no opportunity to apprehend the situation and act accordingly. The sudden emergency doctrine is frequently employed in motor vehicle accident cases wherein a driver was confronted with a perilous situation requiring a quick response in order to avoid a collision. The rule provides[,] generally, that an individual will not be held to the "usual degree of care" or be required to exercise his or her "best judgment" when confronted with a sudden and unexpected position of peril created in whole or in part by someone other than the person claiming protection under the doctrine. The rule recognizes that a driver who, although driving in a prudent manner, is confronted with a sudden or unexpected event which leaves little or no time to apprehend a situation and act accordingly[,] should not be subject to liability simply because another perhaps more prudent cause of action was available. Rather, under such circumstances, a person is required to exhibit only an honest exercise of judgment. The purpose behind the rule is clear: a person confronted with a sudden and unforeseeable occurrence, because of the shortness of time in which to react, should not be held to the same standard of care as someone confronted with a foreseeable occurrence. It is important to recognize, however, that a person cannot avail himself of the protection of this doctrine if that person was himself driving carelessly or recklessly.

*Id*. at 159-60, *citing Levey v. DeNardo*, 725 A.2d 733, 735-36 (Pa. 1999) (*quoting Lockhart v. List*, 665 A.2d 1176, 1180 (Pa. 1995)). The Court emphasized that the *Graham* case illustrated the "considerable tension between granting a driver the sudden emergency instruction" and "the

heightened vigilance that the law long has imposed upon drivers to remain wary of pedestrians even at less traveled intersections, as well as the duty of a driver not to drive at a speed that exceeds his ability to stop within the range of his vision." *Graham*, *supra* at 168-69.

Clearly, driving at night requires more concentration and awareness than driving in daylight, even absent adverse weather conditions. In the instant case, Bennett was familiar with the area; he was aware of the location of the Owl's Nest and the Owl's Nest parking lot. Patrons of the Owl's Nest would foreseeably cross the street to the parking lot. Moreover, this is not a "dart-out" case. There is no indication in the record that Plaintiffs, both in their seventies, were running across the road or that they appeared two feet in front of Bennett's vehicle out of nowhere. In fact, the only eyewitness testified that he saw Olar moving slowly as he crossed the roadway. Here, like in *Graham*, the only evidence of "suddenness" arose "from [Bennett's] failure to observe [Plaintiffs] until [they were] nearly upon him." *Graham*, *supra* at 169-70.

Further, there was no obstruction in the roadway, no oncoming traffic casting a glare upon Bennett's vehicle, no vehicles behind him, and no adverse weather conditions. The area had no topographic anomalies, such as S-curves or a hill crest that would obstruct a driver's view; it was a straightaway lit by streetlights and business signs. Moreover, Bennett testified he had his low-beam headlights on, which shine 125 to 150 feet in front, and both experts agreed that if Bennett were traveling at 25 mph, he would have been 154 feet

away from the crash site when the Plaintiffs entered the roadway. Even granting the defense expert's opinion that, at Bennett's distance and speed, Bennett would have had very little time to react, "that does not necessarily establish a sudden emergency in the narrow fashion in which we have employed that term to describe only unforeseeable events." *Id.* at 170.

> [O]n a question of negligence, it is immaterial that the defendant only saw the [pedestrian] at or about the time of impact. The test is whether . . . he should have seen the [pedestrian] before the impact. This speaks also to speed itself, inasmuch as drivers' ordinary duty requires that they proceed only at a speed that enables an effective response to foreseeable incursions into their paths. . . . To suggest that twenty-five miles-per-hour is not high speed begs the question; speed is relative, and any speed that outstrips the driver's ability to respond to foreseeable events is "high" as a matter of settled law.

*Id.* (quotations and citation omitted). *See also Forsythe v. Wohlfarth*, 209 A.2d 868, 870-71 (Pa. Super. 1965).

Based on our review of the record in this case, the evidence presented does not support a determination that Bennett was "confronted with a sudden and unforeseeable occurrence[.]" *See Graham*, *supra*; *see also Lockhart*, *supra* at 1180 (purpose behind sudden emergency doctrine is that driver confronted with sudden and unforeseeable occurrence, because of shortness of time in which to react, should not be held to same standard of care as someone confronted with foreseeable occurrence); *Schofield v. Druschel*, 59 A.2d 919, 922 (Pa. 1948) (having one's car under control means that in any situation reasonably likely to arise, driver will be able to stop his car before doing injury to person or property). As Bennett testified, he does not know

- 16 -

why he did not see Plaintiffs in the roadway until impact. Under these circumstances, a driver's inexplicable failure to see pedestrians crossing the road is not a sudden emergency. Like in **Graham**, it might not be negligence under the circumstances that Bennett did not see Plaintiffs sooner, "but that does not make the situation a sudden emergency, only an unfortunate one." **Graham**, **supra** at 170.

We conclude, therefore, that the trial court committed reversible error in failing to instruct the jury on a driver's duty of care and in charging the jury on sudden emergency. **See Pledger**, **supra** (error in charge occurs when charge as whole is inadequate or not clear or has tendency to mislead or confuse rather than clarify material issue). Accordingly, we reverse and remand for a new trial.

Judgment reversed; case remanded for new trial. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

12/29/2023